*JJW*
*12/19/19*

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2020 FEB -4  AM 9:35

CLERK'S OFFICE
AT BALTIMORE

BY_____ DEPUTY



**U.S. Department of Justice**
*United States Attorney*
*District of Maryland*

Derek Hines
Assistant United States Attorney
derek.hines@usdoj.gov

Suite 400
36 S. Charles Street
Baltimore, MD 21201-3119

DIRECT: 410-209-4817
MAIN: 410-209-4800

December 19, 2019

Andrew R. Szekely, Esq.
Kirstin Maguire Hopkins, Esq.
Office of the Federal Public Defender
100 S Charles St Tower II Ste 900
Baltimore, MD 21201

19-cr-0264

Re:   United States v. Chad Arrington a/k/a "Chad Focus"

Dear Counsel:

This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, Chad Arrington (hereinafter "Defendant"), by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. If this offer has not been accepted by January 10, 2020, it will be deemed withdrawn. The terms of the Agreement are as follows:  24  KH  CSA DEH

### Offenses of Conviction

1.   The Defendant agrees to plead guilty to Count 1 of the Indictment, which charges the Defendant with Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. § 1349. The Defendant admits that the Defendant is, in fact, guilty of this offense and will so advise the Court.

### Elements of the Offense

2.   The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

   a. First, that in the District of Maryland and elsewhere, there was a scheme and artifice to defraud and to obtain money and property by materially false and fraudulent pretenses, representations and promises using interstate wire communications as alleged in the Indictment; and

1

b. Second, that the Defendant knowingly and willfully conspired and agreed with at least one other person to participate in the scheme and artifice to defraud and to obtain money and property.

## Penalties

3. The maximum penalties provided by statute for the offense to which the Defendant is pleading guilty are as follows:

| COUNT | STATUTE | MAND. MIN. IMPRISON-MENT | MAX IMPRISON-MENT | SUPERVISED RELEASE | MAX FINE | SPECIAL ASSESS-MENT |
|---|---|---|---|---|---|---|
| 1 | 18 U.S.C. § 1349 | None | 20 years | Not more than 3 years | $250,000 or 2X the gross gain | $100 |

a. Prison: If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

b. Supervised Release: If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment up to the entire original term of supervised release if permitted by statute, followed by an additional term of supervised release.

c. Restitution: The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

d. Payment: If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d). The Defendant may be required to pay interest if the fine is not paid when due.

e. Collection of Debts: If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt. If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law. Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control. Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns. The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

## Waiver of Rights

4. The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

    a. If the Defendant had pled not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

    b. If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

    c. If the Defendant went to trial, the government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

    d. The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

    e. If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

    f. By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

    g. If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up

3

the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

      h.      By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

### Advisory Sentencing Guidelines Apply

5.      The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. § 3551-3742 (excepting 18 U.S.C. § 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

### Factual and Advisory Guidelines Stipulation

6.      This Office and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A, which is incorporated by reference herein. This Office and the Defendant further agree that the applicable guideline calculation is as follows:

    a. Base offense level (U.S.S.G. § 2B1.1(a)(1)              7
    b. More than $3.5 Million Loss (U.S.S.G. § 2B1.1(b)(J))   +18
                                             TOTAL     25

This Office does not oppose a two-level reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. § 3E1.1(a), based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional one-level decrease in recognition of the Defendant's acceptance of personal responsibility for the Defendant's conduct. This Office may oppose any adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a) and may decline to make a motion pursuant to U.S.S.G. § 3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies

4

involvement in the offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way. If the defendant earns the acceptance of responsibility adjustment, his **final offense level is 22.**

7. There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. The parties presently anticipate that the Defendant's criminal history is a category I, but the U.S. Probation Office will determine the Defendant's criminal history category. *The Defendant reserves the right to move for a downward departure pursuant to USSG 4A1.3(b)(1) for over-representation of criminal history. The government reserves the right to object to such a motion.*

8. Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

*DEH   KH   CSR*

### Obligations of the Parties

9. At the time of sentencing, this Office and the Defendant reserve the right to advocate for a reasonable sentence, period of supervised release, and/or fine considering any appropriate factors under 18 U.S.C. § 3553(a). This Office reserves the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that this Office deems relevant to sentencing, including the conduct that is the subject of any counts of the Indictment. At the time of sentencing, this Office will move to dismiss any open counts against the Defendant.

### Waiver of Appeal

10. In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

   a. The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute(s) to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute(s) to the extent such challenges legally can be waived.

   b. The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or

5

condition of supervised release), except as follows: the Defendant reserves the right to appeal any sentence that exceeds the statutory maximum.

c.   The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

## Restitution

11.   The Defendant agrees to the entry of a Restitution Order for the full amount of the victims' losses in the amount of $4,142,435.31. The Defendant agrees that, pursuant to 18 U.S.C. §§ 3663 and 3663A and §§ 3563(b)(2) and 3583(d), the Court may order restitution of the full amount of the actual, total loss caused by the offense conduct set forth in the factual stipulation. The Defendant further agrees that he will fully disclose to the probation officer and to the Court, subject to the penalty of perjury, all information, including but not limited to copies of all relevant bank and financial records, regarding the current location and prior disposition of all funds obtained as a result of the criminal conduct set forth in the factual stipulation. The Defendant further agrees to take all reasonable steps to retrieve or repatriate any such funds and to make them available for restitution. If the Defendant does not fulfill this provision, it will be considered a material breach of this Agreement, and this Office may seek to be relieved of its obligations under this Agreement.

## Defendant's Conduct Prior to Sentencing and Breach

12.   Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

13.   If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (i) this Office will be free from its obligations under this Agreement; (ii) this Office may make sentencing arguments and recommendations different from those set out in this Agreement, even if the Agreement was reached pursuant to Rule 11(c)(1)(C); and (iii) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea—even if made pursuant to Rule 11(c)(1)(C)—if the Court finds that the Defendant breached the Agreement.

### Court Not a Party

14.  The Court is not a party to this Agreement. The sentence to be imposed is within the sole discretion of the Court. The Court is not bound by the Sentencing Guidelines stipulation in this Agreement. The Court will determine the facts relevant to sentencing. The Court is not required to accept any recommendation or stipulation of the parties. The Court has the power to impose a sentence up to the maximum penalty allowed by law. If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations under this Agreement. Neither the prosecutor, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

### Entire Agreement

15.  This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

*[Remainder of Page Intentionally Blank]*

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Robert K. Hur
United States Attorney

By: *[signature]*
Derek E. Hines
Mary W. Setzer
Assistant United States Attorneys

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

1/16/20
Date

*[signature]*
Chad Arrington
Defendant

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

1/16/2020
Date

*[signature]*
Andrew R. Szekely, Esq.
Kirstin Maguire Hopkins, Esq.
Assistant Federal Public Defenders
Counsel for Defendant

8

## ATTACHMENT A
## STIPULATION OF FACTS

*The Defendant, Chad Arrington, stipulates and agrees that if this case had proceeded to trial, the United States would have proven the following facts beyond a reasonable doubt. The Defendant stipulates and agrees that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

### Background

**ARRINGTON** was a resident of Owings Mills, Maryland and then Randallstown, Maryland. **ARRINGTON** was employed by Company 1 as a Search Engine Optimization ("SEO") Specialist from approximately 2011 to August 2018. As an SEO Specialist, **ARRINGTON** was responsible for promoting and marketing Company 1's products and services online. Company 1 assigned **ARRINGTON** an American Express company credit card (the "Credit Card") after he signed an Agreement in which he agreed to use the Credit Card only for business expenses related to Company 1. The Credit Card was periodically replaced and was associated with account numbers ending in 62006, 63004, 64002, 65009, 66007, 67005, 68003, and 69001.

Co-Conspirator 1 was a resident of Owings Mills, Maryland. Co-Conspirator 2 was a resident of York, Pennsylvania. Co-Conspirator 3 was a resident of Alexandria, Virginia. Co-Conspirator 4 was a resident of Sarasota, Florida.

### Arrington Fraudulently Purchases Music Equipment in an Attempt to Start a Career as a Hip-Hop Artist

Between June 1, 2016, and July 25, 2018, **ARRINGTON** used the Credit Card to make unauthorized purchases of sound equipment, studio kits, instruments and music technology for his personal use, including the purchase of over $65,000 of musical equipment from a music technology and instrument retailer on or about June 10, 2016.

### Arrington Fraudulently Buys Followers, Tags, and Views to Falsely Appear More Popular

On or about January 27, 2017, **ARRINGTON** organized a Maryland Limited Liability Company called Focus Music Entertainment LLC which, according to its Articles of Organization, was formed for the purpose of "marketing music management branding entertainment services." Using the equipment that he fraudulently obtained, **ARRINGTON** created an artist alter-ego, "Chad Focus," and produced a number of hip-hop songs through his company, Focus Music Entertainment LLC.

**ARRINGTON** used the Credit Card to make unauthorized purchases from online streaming platforms that offered services where artists could pay to have the platforms artificially increase their song play counts on Spotify and other music platforms. For example, beginning

9

June 11, 2017, and continuing through September 25, 2017, **ARRINGTON** purchased over $20,000 in services from Streamify.

On August 22, 2017, **ARRINGTON** sent an email to the support personnel for Streamify with the subject line "Need Help With My Campaign," in which **ARRINGTON** stated, in part:

> I've neared [sic] spent $5000 plus or more with you guys this month and I want to keep building my momentum. Could I spent [sic] more money and make sure my track continues to get hundreds of thousands of plays per day? If I stop promotion do you remove me from playlists or are these permanent placements? Will the plays just fall completely off or will we see real listeners and followers and continue to build?

Between April 7, 2018, and July 26, 2018, **ARRINGTON** fraudulently used the Credit Card to purchase "likes," "followers," "tags" and "views" across various social media and viewing platforms, such as Facebook, Instagram and YouTube. **ARRINGTON** used the Credit Card to make unauthorized payments to an online platform company to promote his brand by paying accounts for "likes," "followers," "tags," and "views" to make his brand appear more popular.

On or about April 25, 2018, **ARRINGTON** asked the online platform company to find him "likes" and "views" for **ARRINGTON**'s posts in the following direct message exchange:

| | |
|---|---|
| Representative: | . . . I start work to increase followers parller [sic] working on IG [Instagram] post tag. |
| **ARRINGTON**: | ok. my ig [Instagram] need views/likes for these.posts. dont worry bout tags..gimme.likes and views |
| **ARRINGTON**: | ig [Instagram] is deleting all ya taggin anyways |
| Representative: | Ok chad we start giving you like and views |
| Representative: | With tagging |
| **ARRINGTON**: | ok |
| **ARRINGTON**: | wow ok thanks lets rock this!!! |

Between in or about January 18, 2016, and July 24, 2018, **ARRINGTON** used the Credit Card to make over $300,000 worth of unauthorized purchases from Fiverr, a company that offered services to boost the popularity of artists. According to invoices and communications with Fiverr, the purchases were for various services, including "do radio promotion and fm chart placement in US," "create or design your facebook fanpage," "promote your hip hop song on fm station and expose to 1000," "submit music to top records labels," "guarantee billboard charts n drt n itunes n European" and other purchases to promote his social media streams.

Between October 3, 2017, and April 14, 2018, **ARRINGTON** used the Credit Card to make unauthorized purchases of over $70,000 worth of services from Jaywan Inc., including the promotion of mixtape videos and singles. Jaywan Inc. provided **ARRINGTON** with services to promote his image and music including YouTube "views" (100,000 views for $1,119), Spotify "streaming" (250,000 streams for $1,999), and Instagram "followers" (15,000 followers for $1,499).

### Arrington Fraudulently Purchases Tickets to His Own Concerts and Events

Between October 22, 2017, and July 29, 2018, **ARRINGTON** made unauthorized purchases of hundreds of concert and event tickets using the Credit Card, including the purchase of tickets to events where he performed, such as $125,000 in tickets to the "One Heartless Summer Harder Than Ever Tour" from Ticketmaster. **ARRINGTON** used the Credit Card to make unauthorized purchases of tickets to other events throughout the United States, which he attended with Co-Conspirator 1 and Co-Conspirator 2.

### Arrington Places Images of Himself on Billboards throughout the United States

Between July 1, 2017, and October 30, 2017, **ARRINGTON** used the Credit Card to make over $12,000 in unauthorized payments to "B. Classic Photography," a company operated by Co-Conspirator 1. **ARRINGTON** also used a digital wallet and payment processor to make unauthorized purchases of over $55,000 from Co-Conspirator 1. Co-Conspirator 1 and his company provided photographic and video recording services related to Chad Focus music.

Between May 14, 2018, and August 2018, **ARRINGTON** used the Credit Card to make unauthorized payments to multiple billboard companies to display images of **ARRINGTON** and his website throughout the United States and to promote Chad Focus and Focus Music Entertainment LLC. These unauthorized purchases included, for example, a billboard which contained an image of **ARRINGTON** surrounded by stacks of cash and the words, "Get to the Money," another billboard that depicted an image of **ARRINGTON** with the words, "Chad Focus. I will teach you how to be rich," and another billboard which depicted his hip-hop alter-ego, Chad Focus, staring at his real-life persona, Chad **ARRINGTON**, with the caption "Fame vs. Power."

### Arrington Fraudulently Obtains Cash and Jewelry for Himself

**ARRINGTON** utilized the Credit Card to charge unauthorized payments to various entities controlled by **ARRINGTON** and his Co-Conspirators. **ARRINGTON** and his Co-Conspirators used these entities as conduits to funnel cash back to **ARRINGTON's** personal bank accounts, as well as to the personal bank accounts of Co-Conspirator 2 and Co-Conspirator 3. Beginning at the latest on February 11, 2015, and continuing through August 2018, **ARRINGTON** charged the Credit Card over $72,000 for purchases from "NUKEMYRANK" ("NMR"), an account controlled by **ARRINGTON** and registered with an online payment processor. **ARRINGTON** then transferred this money from the online payment processor to **ARRINGTON's** personal bank account.

Between April 15, 2015, and December 27, 2015, **ARRINGTON** charged the Credit Card for over $133,000 in unauthorized purchases from "BackLinksMaker.com," an account controlled by Co-Conspirator 3 and registered with an online payment processor. Co-Conspirator 3 then transferred over $90,000 to **ARRINGTON's** NMR account registered with an online payment processor, and over $20,000 to Co-Conspirator 3's personal bank account.

Between March 9, 2016, and July 16, 2018, **ARRINGTON** charged the Credit Card over $1.3 million dollars for unauthorized purchases from MediaLinkPro, an account controlled by Co-Conspirator 2 and registered with an online payment processor.

On June 2, 2016, a representative from the online payment processor sent an email to Co-Conspirator 2 questioning charges to Co-Conspirator 2's account from the Credit Card. The representative stated:

> I'm reaching out about an important issue with your [] account. As part of our ongoing monitoring of all [] accounts, we need some additional information about your business and use of our services. Please reply to this email with: a description of the goods or services that are presently being sold through your [] account, and a description of your relationship with active customer with card ending in [] and any explanation behind their repetitive charges. We need to gain some clarity on these questions in order to fulfill our KYC (know your customer) requirements, so I appreciate you working with me on this! We will need to confirm this information before we can resume transfers to your bank account.

On or about June 3, 2016, **ARRINGTON** created a document as a response to the representative's inquiry, which **ARRINGTON** sent from his Company 1 email address to his personal email address. On June 6, 2016, Co-Conspirator 2 then emailed the exact text of the document that **ARRINGTON** had created to the representative from the online payment processor. The document stated, in part, "It has been a please [sic] to work with Mr. Arrington and we truly are the best in this industry in building Custom promotions for any website to rank. Chad Arrington is one of many satisfied customers and we hope to look forward to great working relationship for years to come." The online payment processor subsequently unfroze Co-Conspirator 2's account and Co-Conspirator 2 then transferred over $1.3 million to Co-Conspirator 2's personal bank accounts.

Between March 17, 2016, and July 31, 2018, Co-Conspirator 2 withdrew over $900,000 cash from his personal bank accounts. During this same time period, **ARRINGTON** deposited over $300,000 cash into his personal bank accounts. For example, on July 6, 2017, Co-Conspirator 2 transferred $4,854 from his online payment processing account to his personal bank account. On July 7, 2017, Co-Conspirator 2 withdrew $4,500 from his personal bank account at a branch in York, Pennsylvania. This same day, **ARRINGTON** deposited $2,100 at an ATM in York, Pennsylvania.

Co-Conspirator 2 also funneled payments back to **ARRINGTON** through wires. For example, on or about March 22, 2018, Co-Conspirator 2 wired $1,550 from his personal bank account to **ARRINGTON**'s online payment processing account, which **ARRINGTON** then used for his own personal gain.

Between March 29, 2018, and July 5, 2018, **ARRINGTON** used the Credit Card to purchase over $65,000 worth of custom jewelry, including a bear pendant valued at $11,500. **ARRINGTON** posted several images and videos to his Instagram account showing him wearing the bear pendant. The post said, "Jewels ima show you what it's bout . . . Ain't no DEBATE check the chart, check the Count! Prolly don't know what I'm talking about! All about money! All about cash! Dj spin MY RECORD . . ."

### Arrington Attempts to Appear to be a Legitimate Artist by Fraudulently Purchasing Luxury Vehicle Rentals, Travel and Night Life Expenses

Beginning at the latest in January 2015 and continuing through August 2018, **ARRINGTON** charged the Credit Card over $300,000 for various unauthorized international and national travel expenses, hotels, airfare, restaurant bills, luxury vehicle rentals, night life expenses and other miscellaneous expenses. **ARRINGTON** also charged the Credit Card for unauthorized travel expenses and airline tickets for the benefit of Co-Conspirator 1 and Co-Conspirator 2.

Between approximately December 11, 2017, and June 18, 2018, **ARRINGTON** used the Credit Card to make over $100,000 in unauthorized purchases of clothing and accessories, including hats that displayed his artist name, "Focus," and other apparel. **ARRINGTON** provided the clothing and accessories to his associates, free of charge. For example, on February 16, 2018, **ARRINGTON** sent a message to an associate and said, ". . . GOT SOME GIFTS 4 u. Just wanted to [] mail you a FOCUSWEAR Appreciate package. Want to send you a Focus Fitted Hat, Dad Hat, T-shirts, Sweatshirt, Smartwatch or Combo. Need your SIZES, Full Name, Cell Phone, Address, and Email address please! We want to send ALL gifts off this week . . ."

### Arrington's Other Fraudulent Endeavors

Between approximately July 7, 2018, and July 26, 2018, **ARRINGTON** used the Credit Card to make unauthorized purchases of items, including over $80,000 in purchases of electric bikes, hover boards, and scooters and purchases related to a bike sharing program. **ARRINGTON** also used the Credit Card to make over $25,000 in unauthorized purchases from a company to install bike sharing stations in Maryland. **ARRINGTON** then rented and/or sold these bikes, hoverboards, and scooters for his own personal gain.

**ARRINGTON** used the Credit Card to make unauthorized purchases of over $170,000 from an e-commerce company, including purchases related to **ARRINGTON**'s other business endeavors, such as bicycles and scooters.

13

## Arrington Conceals Fraudulent Charges from his Employer

- *Arrington Forged Supervisor's Signature*

Between approximately January 2015 and August 2018, **ARRINGTON** forged his supervisor's signature and approval on his Credit Card billing statements and sent those false payment authorizations to other employees who relied on the authorizations to ultimately pay off the outstanding balance of the Credit Card.

- *Arrington Altered Billing Statements*

**ARRINGTON**, Co-Conspirator 1 and Co-Conspirator 4 created false entries on the Credit Card billing statements to conceal certain purchases and make the payments appear company-related. For example, on June 6, 2016, **ARRINGTON** emailed Co-Conspirator 4 and said, "I want to get amazing edits to my amex statement. Basically, I gotta change some different vendors and numbers on my amex statement. Gotta look just like the original. I'm sending you a spreadsheet. After this clean job we can get to the emojis and have some fun." Attached to the email were **ARRINGTON**'s Credit Card statements for April and May 2016 and a spreadsheet of requested edits to vendor names and payment amounts. **ARRINGTON** subsequently submitted to his supervisor a false American Express statement that had been edited by Co-Conspirator 4 and contained false information.

On August 1, 2016, **ARRINGTON** emailed Co-Conspirator 4 and said, "SO I need you to send me back 2 perfectly edited statements . . . PDF can never look edit [sic]. Has to be identical to original. You are a beast at that anyways." On August 9, 2016, **ARRINGTON** emailed Co-Conspirator 4, and stated, in part:

> My entire back is against the Wall bro. I have till Midnight Tuesday 8/9/16 to turn in my edited statements bro. I've been emailed by my account manager 3 times reminding me it can't be late. If I don't turn in by Midnight they will suspend my account. If I don't have statement turned in by Noon Wednesday 8/10/16 I will be Permanently Suspended and fired from my contract. [Co-Conspirator 4,] I needed these last week but right now it's real Bro . . . Please bro move mountains for me. I would send you more Money if need be but all my invoices I paid for you through this same statement account. They shut my account down I have no credit to work with you or anyone else. Please bro. Ttyl.

- *Arrington Created Fake Invoices*

**ARRINGTON** and Co-Conspirator 1 created false invoices for **ARRINGTON** to submit to conceal unauthorized purchases on the Credit Card. For example, on March 13, 2017, **ARRINGTON** sent Co-Conspirator 1 an email with the subject line " . . . Classified Work SHit . . ." **ARRINGTON** stated:

14

SO I need you to send me back perfectly edited statements. 1. Statements needs to include ALL EDITS to ALL PAGES found below. -Please keep the size of the file as close as possible to the original. The original is 146KB so best we can keep file size down. AND MAKE sure we don't lose any quality. Nobody can know document was edited. SO have to be perfect. -PDF can never look edited. Has be identical to original. -I've attached ORIGNAL PDF and PDF SCREENSHOTS with my edits on it. You can see the numbers and where to specifically edit. PLEASE DO GREAT JOB . . .

Attached to the above email was a billing statement for the Credit Card, and **ARRINGTON** requested that specific edits be made to particular purchases to conceal the vendor and the nature of the purchase.

Total Fraud

Between January 2015 and August 2018, **ARRINGTON** used the Credit Card to charge $4,142,435.31 in fraudulent expenses. **ARRINGTON** agrees that a loss figure of over $3.5 million and less than $9.5 million was reasonably foreseeable to him in furtherance of the conspiracy.

SO STIPULATED:

_____
Derek E. Hines
Mary W. Setzer
Assistant United States Attorneys

_____
Chad Arrington
Defendant

_____
Andrew R. Szekely, Esq.
Kirstin Maguire Hopkins, Esq.
Assistant Federal Public Defenders
Counsel for Defendant

15